Citation Nr: 1722381 
Decision Date: 06/15/17 Archive Date: 06/29/17

DOCKET NO. 09-25 019 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Winston-Salem, North Carolina


THE ISSUES

1. Whether new and material evidence sufficient to reopen a claim for entitlement to service connection for a left shoulder disability has been submitted.

2. Entitlement to service connection for posttraumatic stress disorder.

3. Entitlement to service connection for left knee strain.

4. Entitlement to service connection for right knee strain.

5. Entitlement to an increased rating greater than 10 percent for recurrent lumbosacral strain.

6. Entitlement to a total disability rating based on individual unemployability (TDIU) prior to August 15, 2014.



REPRESENTATION

Appellant represented by: Karl A. Kazmierczak, Attorney at Law


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

C. J. Houbeck, Counsel


INTRODUCTION

The Veteran had active service from May 1993 to April 1997, from September 1999 to December 2000, and from January 2004 to March 2006.

These matters come before the Board of Veterans' Appeals (Board) on appeal from an October 2007 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Winston-Salem, North Carolina. 

The Veteran was afforded a hearing before the undersigned at the RO in August 2013. A transcript of the proceeding has been associated with the electronic claims file.

The Board remanded the above claims in December 2013 and March 2016 for additional development. The matter again is before the Board.

Based on the association of VA treatment records, the August 2014 VA medical examination, the March 2016 notice letter to the Veteran, and subsequent readjudication of the claims, the Board finds that there has been substantial compliance with its remand directives. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

This appeal was processed using the Veteran's Benefits Management System (VBMS) and Virtual VA paperless claims processing systems. Accordingly, any future consideration of the Veteran's case should take into consideration the existence of these electronic records.

The issues of new and material evidence for a left shoulder disability and each of the above service connection claims are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's low back disability is manifested by painful motion, tenderness, and limited motion with forward flexion better than 60 degrees. The combined range of motion is better than 120 degrees.

2. For the entire appellate time period, the Veteran's service-connected disabilities have precluded her from securing and following a substantially gainful occupation.


CONCLUSIONS OF LAW

1. The criteria for a disability rating greater than 10 percent for recurrent lumbosacral strain have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.321, 4.1, 4.2, 4.3, 4.7, 4.40, 4.45, 4.71a, Diagnostic Code (DC) 5237 (2016).

2. The criteria for entitlement to TDIU have been met from March 29, 2006. 38 U.S.C.A. § 1155, 5107 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16(a) (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duty to Notify and Assist

Neither the Veteran nor her representative has identified any shortcomings in fulfilling VA's duty to notify and assist. See Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). For the above reasons, the Board finds the duties to notify and assist have been met, all due process concerns have been satisfied, and the appeal may be considered on the merits.

Increased Rating

Disability evaluations are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his or her ability to function under the ordinary conditions of daily life, including employment, by comparing his or her symptomatology with the criteria set forth in the Schedule for Rating Disabilities. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and the residual conditions in civilian occupations. Generally, the degree of disabilities specified are considered adequate to compensate for considerable loss of working time from exacerbation or illness proportionate to the severity of the several grades of disability. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2016). Separate DCs identify the various disabilities and the criteria for specific ratings. If two disability evaluations are potentially applicable, the higher evaluation will be assigned to the disability picture that more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016). Any reasonable doubt regarding the degree of disability will be resolved in favor of the Veteran. 38 C.F.R. § 4.3 (2016).

The Veteran's entire history is reviewed when making a disability determination. See 38 C.F.R. § 4.1 (2016). VA must consider whether the Veteran is entitled to "staged" ratings to compensate when his or her disability may have been more severe than at other times during the course of his or her appeal. Here, the disability has not significantly changed and a uniform evaluation is warranted.

The evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14 (2016). The critical element in permitting the assignment of several ratings under various DCs is that none of the symptomatology for any one of the disabilities is duplicative or overlapping with the symptomatology of the other disability. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994).

The Veteran's low back disability is rated under DC 5237 for lumbosacral strain. 38 C.F.R. § 4.71a, DCs 5237 (2016). The Veteran alleges her low back disability is more severe than currently rated.

Disabilities of the spine are rated under the General Rating Formula for Diseases and Injuries of the Spine (for DCs 5235 to 5243, unless 5243 is evaluated under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes). 

The General Rating Formula for Diseases and Injuries of the Spine provides a 10 percent disability rating for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or, combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. A 20 percent disability rating is assigned for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. A 40 percent disability rating is assigned for forward flexion of the thoracolumbar spine 30 degrees or less; or, favorable ankylosis of the entire thoracolumbar spine. A 50 percent disability rating is assigned for unfavorable ankylosis of the entire thoracolumbar spine. A 100 percent disability rating is assigned for unfavorable ankylosis of entire spine. 38 C.F.R. § 4.71a. 

These criteria are to be applied irrespective of whether there are symptoms such as pain (whether or not it radiates), stiffness, or aching in the affected area of the spine, id, and they "are meant to encompass and take into account the presence of pain, stiffness, or aching, which are generally present when there is a disability of the spine." 68 Fed. Reg. 51,455 (August 27, 2003) (Supplementary Information).

Notes appended to the rating formula for diseases and injuries of the spine specify that, for VA compensation purposes, normal forward flexion of the thoracolumbar spine is zero to 90 degrees, extension is zero to 30 degrees, left and right lateral flexion are zero to 30 degrees, and left and right lateral rotation are zero to 30 degrees. The normal combined range of motion of the thoracolumbar spine is 240 degrees. Id, Note (2). Provided, however, that, in exceptional cases, an examiner may state that because of age, body habitus, neurologic disease, or other factors not the result of disease or injury of the spine, the range of motion of the spine in a particular individual should be considered normal for that individual, even though it does not conform to the normal range of motion generally recognized by VA. Id, Note (3). Further, the term "combined range of motion" refers to "the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation"; provided, however, that the aforementioned normal ranges of motion for each component of spinal motion, as recognized by VA, are the maximum that can be used for calculation of the combined range of motion, and each range of motion measurement is to be rounded to the nearest five degrees. Id, Notes (2) and (4). Note (5) provides that, for VA compensation purposes, unfavorable ankylosis is a condition in which the entire cervical spine, the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. Fixation of a spinal segment in neutral position (zero degrees) always represents favorable ankylosis. Note (6) provides that disability of the thoracolumbar and cervical spine segments are to be rated separately, except when there is unfavorable ankylosis of both segments, which will be rated as a single disability. Id. 

Spine conditions rated under DC 5243, for intervertebral disc syndrome, may be rated alternatively based on incapacitating episodes. The criteria provide for a 10 percent rating where intervertebral disc syndrome is manifested with incapacitating episodes having a total duration of at least one week but less than two weeks during the past 12 months. A 20 percent rating was warranted where incapacitating episodes have a total duration of at least two weeks but less than 4 weeks during the past 12 months. "Incapacitating episodes" was defined in Note (1) as a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. Note (2) also allowed the Veteran to be rated separately for musculoskeletal and neurological manifestations under appropriate DCs if it would result in a higher combined evaluation for the disability.

In general, evaluation of a service-connected disability involving a joint rated on limitation of motion requires adequate consideration of functional loss due to pain under 38 C.F.R. § 4.40 and functional loss due to weakness, fatigability, incoordination or pain on movement of a joint under 38 C.F.R. § 4.45. See DeLuca v. Brown, 8 Vet. App. 202 (1995). The provisions of 38 C.F.R. § 4.40 state that disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence of part, or all, of the necessary bones, joints and muscles, or associated structures. It may also be due to pain supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. See 38 C.F.R. § 4.40. The factors of disability affecting joints are reduction of normal excursion of movements in different planes, weakened movement, excess fatigability, swelling and pain on movement. See 38 C.F.R. § 4.45. 

The Veteran was afforded a VA examination for the spine in September 2007. The Veteran reported low back pain with radiation. She got flare-ups of pain with stooping, bending, lifting, or strenuous activity. The Veteran did not use any assistive devices. She denied any incapacitating episodes in the previous year, but did have daily pain. The Veteran had no problems with activities of daily living and when her back hurt she usually could work through it. On examination, range of motion testing of the thoracolumbar spine showed forward flexion to 90 degrees, extension to 25 degrees, right and left lateral flexion to 30 degrees, and left and right lateral rotation to 45 degrees. There was pain at the endpoints of motion. Repetitive motion did not increase the loss of motion and there was no spasm, weakness, or tenderness. There were no associated postural abnormalities and no atrophy. Neurological testing was negative.

In an August 2008 statement, the Veteran reported that she experienced back pain whenever attempting to lift something or carry a heavy item. She was always conscious about moving her back and with certain activities.

VA treatment records include ongoing complaints of and treatment for back pain, including physical therapy, medication, and the use of a back brace. In November 2009, the Veteran was seen for low back pain flare-ups. On examination, there was mild reproducible tenderness of the low back muscles with movement, but no focal motor / sensory deficits of the legs. Leg muscle strength was normal bilaterally. In March 2010, there was no spinal tenderness on examination, no muscle spasms, and no focal motor / sensory impairment of the legs. Straight leg raise testing was negative. The assessment was complaints of back pain with mild scoliosis. During physical therapy in May 2010, there was moderate tenderness in the right lumbar area and dull pain in the lumbar area to the lower extremity. 

The Veteran was afforded a VA examination for the spine in May 2011. The examiner noted review of the claims file. Currently, the Veteran used a back brace, TENS unit, and pain medication, but her back still "really hurts twice a week." She described 20 severe flare-ups generally lasting 5 to 7 days that was precipitated by sitting on a cold toilet seat. Her pain was alleviated by lying in bed and homeopathic remedies. There was no urinary or fecal incontinence. She denied a history of fatigue, decreased motion, weakness, or spasms, but did note stiffness and pain. The pain was constant and severe. On examination, posture, gait, and head position were normal. Scoliosis was noted, but there were no other abnormal spinal curvatures. On examination, there was pain with motion, but no spasm, atrophy, guarding, tenderness, or weakness. Active range of motion testing showed forward flexion to 90 degrees, extension to 30 degrees, right lateral flexion to 35 degrees, and all other motion to 30 degrees. There was objective evidence of pain, but no notation as to what point in the arc(s) of motion that pain started. Muscle strength and tone were normal and there was no evidence of muscle atrophy. The examiner indicated that there was no functional impairment of the lumbar spine that could prevent gainful employment in both active and sedentary work.

An August 2013 statement from the Veteran's aunt noted that the Veteran's back pain had kept her from participating in many of the activities she had previously enjoyed.

During her August 2013 Board hearing, the Veteran discussed sleep problems due to back pain, as well as difficulty with standing, sitting, and walking. She was able to sit comfortably for 15 to 20 minutes and spent most of her time at home in a reclined position. She conceded that a physician had not prescribed bed rest for her back pain and other symptoms.

In December 2013, the Veteran described moderately-severe low back pain with radiation to the right thigh and right buttock for the previous year that was worsening and occurred occasionally. She experienced the pain with forward bending, lifting heavy objects, pulling, pushing, sudden or twisting movements, and walking up and down stairs. The symptoms could be aggravated by these and other daily activities, including jumping, running, walking, and sneezing. On examination, there was no kyphosis or scoliosis, but there was spinal tenderness. She was referred to her primary care physician for follow-up and told to seek immediate treatment if symptoms worsened. The Veteran was not prescribed bed rest.

The Veteran was afforded a VA examination for her low back disability in August 2014. The examiner noted review of the claims file and diagnoses of lumbosacral strain, intervertebral disc syndrome (IVDS), mild (non-progressive) scoliosis, and sciatica. The Veteran reported pain flare-ups, which resulted in severe back pain and spasms that frequently caused her to remain in bed for greater than 6 weeks during the last 12 months. On examination, range of motion of the thoracolumbar spine showed forward flexion to 75 degrees, with pain onset at 70 degrees; extension to 5 degrees, with pain onset at 0 degrees; right lateral flexion to 20 degrees, with pain onset at 10 degrees; left lateral flexion to 10 degrees, with pain onset at 5 degrees; and right and left lateral rotation to 20 degrees, with pain onset at 20 degrees. On repetitive use testing, forward flexion was reduced to 65 degrees, extension to 5 degrees, right lateral flexion to 10 degrees, left lateral flexion to 5 degrees, and right and left lateral rotation to 10 degrees. The additional functional loss was due to less movement than normal, excess fatigability, pain on movement, deformity, atrophy of disuse, interference with sitting/standing and/or weight-bearing, and lack of endurance. The back muscles were generally tender to palpation, without focal spasm. There were no muscle spasms or guarding resulting in an abnormal gait or spinal contour. Muscle strength testing of the lower extremities was 5 out of 5 in all but the right hip flexors, where it was 4 out of 5. There was no evidence of muscle atrophy. Reflexes and sensation were normal. There was evidence of radiculopathy, specifically constant moderate pain in the right lower extremity, due to sciatic nerve involvement. The radiculopathy was classified as moderate. There was not ankylosis of the spine or other neurologic abnormality. There was IVDS with incapacitating episodes having a total duration of at least 6 weeks during the past 12 months. The Veteran used no assistive devices for the back problems and remaining functioning would not be better served with amputation and prosthesis. There were no associated surgical scars or other pertinent physical findings. X-rays showed no arthritis or vertebral fracture with loss of 50 percent more of height. The low back disabilities impacted the Veteran's ability to work in that prolonged walking and sitting were very difficult, causing shooting pain down the right leg. Bending down and lifting small packages was impossible due to resulting incapacitating spasm and pain. The examiner also concluded that based on repetitive use testing showing a decrease of 5 to 10 degrees, it was reasonable to assume that during flare-ups there would be at least a 5 to 10 degree loss of motion. As to the diagnosed spinal scoliosis, the examiner concluded that it did not fall into the type of progressive, worrisome scoliosis that tended to occur early in life and require aggressive treatment. Instead, it was very minor scoliosis that was discovered later in life and while the Veteran was functioning well in the service. Because of its subtlety, it could have been missed on an entrance examination and, as such, it was unclear whether it predated service. In any case, the scoliosis was of less than 10 degrees and had been stable for many years. That type of scoliosis was not known to cause progressive pain or problems nor are they even considered for treatment. That said, the examiner found it was at least as likely as not that the Veteran's IVDS was caused by the same injuries in service that resulted in her sciatica.

The Veteran was afforded a contemporaneous August 2014 VA peripheral nerves examination. The examiner diagnosed right leg sciatica. The Veteran reported sciatic pain since 2006, with ongoing mild to moderate daily pain that escalated to severe pain during flare-ups. The examiner noted that the findings were intermittent, which led to confusion on past VA examinations. As above, there was noted moderate constant right lower extremity pain, with intermittent severe pain. Muscle strength was 5 out of 5 in tested joints and there was no muscle atrophy. Reflexes, sensation, and gait were normal and there were no trophic changes. There was moderate, incomplete paralysis of the right sciatic nerve. 

In September 2014, the Veteran sought treatment for a 4-day history of sciatic pain. On examination, she had no kyphosis or scoliosis, but there was tenderness to palpation. Range of motion was normal, as was muscle strength.

A June 2016 statement from the Veteran indicated that she was in chronic and constant pain every day, but did not have the money to go to the doctor's on a daily basis. She noted that her treatment providers "do not write me [prescriptions] for bed rest as I am DISABLED and can get as much rest as my back pain and migraines allow."

In an October 2016 statement, the Veteran's attorney representative argued that an extraschedular rating was warranted for the low back disability. Specifically, the attorney cited to a December 2013 treatment record demonstrating "pain with essentially every aspect of daily living" such as using stairs, bending, coughing, sneezing, twisting, walking, and other activities. The attorney also noted that SSA had found the Veteran unemployable due to her service-connected disabilities. In addition, the attorney argued that the Veteran "did not need a doctor's prescription to go on bed rest as her doctor is well aware of her condition, and she was able to take the necessary rest with her medication whenever the occasion warrants such rest, without a doctor's prescription." The attorney also cited to the August 2014 VA examination report notation of at least 6 weeks of incapacitating episodes in the previous 12 months in support of the foregoing contention.

As an initial matter, the Board finds no prejudice to the Veteran in proceeding with the adjudication even with consideration of Correia v. McDonald, 28 Vet. App. 158 (2016), which held that 38 C.F.R. § 4.59 creates range of motion and other testing requirements with which VA must comply. In this case, the Veteran has reported pain and problems with physical activities, such as lifting, carrying, and other activities and active movements of the body - even to include sneezing and coughing. The foregoing involves problems with active range of motion and during weight-bearing, which has been tested thoroughly during the foregoing examinations. The examination reports did not test the Veteran's passive range of motion of the thoracolumbar spine or any range of motion in a nonweight-bearing environment (to the extent possible); however, there is no contention or indication that she has limited passive range of motion that would be more severe than her limitations on active motion or that her decreased range of motion would be more significant if the spine was not bearing weight. As such, the Board does not find that a remand for additional examination pursuant to the provisions of Correia would serve any useful purpose.

The current evaluation contemplates pain on motion. 38 C.F.R. § 4.59 (2016). Also, it is consistent with forward flexion better than 60 degrees. In order to warrant a higher rating, there must be the functional equivalent of limitation of flexion to 60 degrees or less or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. Following a review of the available evidence in this case, and the applicable laws and regulations, it is the Board's conclusion that the evidence does not warrant a rating greater than 10 percent under any of the spine DCs.

The Veteran's limitation of motion does not warrant a rating greater than 10 percent under DC 5237 because forward flexion of the thoracolumbar spine was not limited to 60 degrees or less, nor was there muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. In that regard, the Board notes that the Veteran does have scoliosis; however, the August 2014 VA examiner indicated that the scoliosis was unrelated to the Veteran's problems. In any case, there have not been findings of muscle spasm or guarding attributed to the scoliosis. Her combined range of motion is better than demanded for a higher rating. As such, the Board concludes that a rating greater than 10 percent under DC 5237 is not warranted.

Similarly, the Veteran is not entitled to a greater rating under any other DC. The Board recognizes that the Veteran has a diagnosis of intervertebral disc syndrome; however, the evidence clearly establishes that she has not had any incapacitating episodes (i.e. bed rest prescribed by a physician) during the appellate time period. The Board acknowledges the arguments of the Veteran and her representative that a physician need not specifically prescribe the bed rest because her treatment providers were aware of her situation and that she was capable of regulating her activities herself. Moreover, she has been unemployed during the entire appellate time period and, as such, it was unnecessary for her to get a physician's note prescribing bed rest for employment purposes. The Board acknowledges all of the foregoing, but Note (1) of the Formula for Rating Invertebral Disc Syndrome Based on Incapacitating Episodes specifically requires that the bed rest be physician-prescribed. As such, DC 5243 is not applicable. 

Under DC 5003 degenerative arthritis, when established by x-ray findings, will be rated on the basis of limitation of motion under the appropriate DCs for the specific joint or joints involved. When the limitation of motion of the specific joint or joints involved is noncompensable under the appropriate DCs, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion to be combined, not added under DC 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. 38 C.F.R. § 4.71a, DC 5003 (2016). In this case, even assuming a current diagnosis of degenerative arthritis, a separate rating under DC 5003 would not be warranted. The Veteran's 10 percent rating under DC 5237, as discussed above, is based on pain on movement and a separate rating under DC 5003 would be for the same symptomatology. As separate ratings may not be assigned for the same symptomatology, a separate 10 percent rating under DC 5003 for the Veteran's painful motion is not warranted.

Separate ratings for neurological manifestations may be warranted under 38 C.F.R. § 4.124a if supported by objective medical evidence. In this regard, the Board notes that an October 2014 rating decision assigned a separate 20 percent disability rating for right lower extremity peripheral neuropathy associated with the service-connected low back disability. The Veteran did not submit a timely notice of disagreement or otherwise express disagreement with the assigned rating or effective date. As such, the Board concludes that further discussion of this aspect of the Veteran's low back disability claim is unnecessary.

As noted, Note 1 of the General Rating Formula for Diseases and Injuries of the Spine also provides for evaluating any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, separately, under an appropriate DC. In this case, the Veteran consistently has denied related bowel or bladder problems. As such, a separate rating for such problems is not warranted. 

The Board notes that the Veteran's functional loss was considered, as the medical evidence shows that the Veteran has consistently complained of pain in the back. 38 C.F.R. §§ 4.40, 4.45. The evidence indicates that the Veteran has range of motion on testing that is consistent with the current rating assigned, even accounting for further limitation following repetitive motion exercises. The Board also finds it significant that the Veteran has normal muscle strength and no evidence of atrophy. Thus, despite the Veteran's reported problems associated with the low back, she clearly is able to use the back in close to a normal manner, to include duration of use, and, in fact, does so. See 38 C.F.R. § 4.40 (noting that, "A little used part of the musculoskeletal system may be expected to show evidence of disuse, either through atrophy, the condition of the skin, absence of normal callosity or the like."). There is otherwise no evidence of significant impairment of motor skills, muscle function, or strength attributable to the Veteran's low back disability not contemplated in the current 10 percent rating. Therefore, the Board finds that a rating greater than 10 percent based on functional loss is not warranted.

As shown above, and as required by Schafrath, 1 Vet. App. at 594, the Board has considered all potentially applicable provisions of 38 C.F.R. Parts 3 and 4, whether or not they have been raised by the Veteran. Accordingly, the preponderance of the evidence is against assignment of an increased disability rating greater than 10 percent under DC 5237 for the Veteran's service-connected low back disability. The Board has considered whether staged ratings were appropriate in the present case. However, for reasons discussed above, the Board finds that there is no competent evidence that the Veteran's service-connected back disability increased in severity during the appeal period sufficient to warrant a higher rating. Therefore, a staged rating is unnecessary.


Additional Considerations

The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extraschedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2016). An exceptional case is said to include such factors as marked interference with employment or frequent periods of hospitalization as to render impracticable the application of the regular schedular standards. See Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, the Board must determine whether the Veteran's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

With respect to the first prong of Thun, the evidence in this case does not show such an exceptional disability picture that the available schedular evaluation for the service-connected low back disability is inadequate. A comparison between the level of severity and symptomatology of the Veteran's low back disability with the established criteria shows that the rating criteria reasonably describe the Veteran's disability level and symptomatology. Specifically, the Veteran reports symptoms such as pain, tenderness, and decreased motion, with resulting effects on walking, standing, sitting, sleeping, lifting, bending, coughing, sneezing, using stairs, and other activities. The Board recognizes that the Veteran's representative has specifically argued that an extraschedular rating is warranted, citing to the Veteran's problems with the foregoing activities due to pain in the low back. The difficulties with the above activities entirely involve problems due to painful movement, which is precisely what the assigned schedular rating is intended to compensate. As such, the Board finds that the current 10 percent rating under DC 5237 contemplates these and other symptoms. 

Finally, entitlement to TDIU is granted herein for the entire period on appeal. As such, consideration of an extraschedular rating under § 3.321(b) is moot based on the combined effects of multiple service connected disabilities, as the purpose of this provision has been fulfilled. See Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014) (observing that "§ 3.321(b)(1) performs a gap-filling function" that "accounts for situations in which a veteran's overall disability picture establishes something less than total unemployability, but where the collective impact of a veteran's disabilities are nonetheless inadequately represented").

In short, the rating criteria reasonably describe the Veteran's disability level and symptomatology. The Board, therefore, has determined that referral of this case for extraschedular consideration pursuant to 38 C.F.R. 3.321(b)(1) is not warranted.

Entitlement to TDIU

Total disability will be considered to exist where there is present any impairment of mind and body that is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340 (2016). Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that the Veteran meets the schedular requirements. If there is only one service-connected disability, this disability should be rated at 60 percent or more; if there are two or more disabilities, at least one should be rated at 40 percent or more with sufficient additional service-connected disability to bring the combination to 70 percent or more. 38 C.F.R. § 4.16(a) (2016).

Substantially gainful employment is defined as work which is more than marginal and which permits the individual to earn a living wage. Moore v. Derwinski, 1 Vet. App. 356 (1991).

The Veteran is service-connected for migraine headaches, evaluated as 50 percent disabling; exercise induced asthma, evaluated at 30 percent disabling; residuals of right shoulder recurrent rotator cuff tears and multiple surgeries with bursitis, evaluated as 20 percent disabling; peripheral neuropathy, sciatic, right lower extremity, evaluated as 20 percent disabling from August 15, 2014; recurrent lumbosacral strain with intervertebral disc syndrome, evaluated as 10 percent disabling; and scars, right shoulder, evaluated as noncompensably disabling. Her combined disability rating is 70 percent prior to September 26, 2007, and 80 percent therefrom. Thus, the Veteran meets the percentage rating standards for TDIU for the entire appellate time period. 38 C.F.R. § 4.16(a). The Board must now consider whether the evidence reflects that the Veteran's service-connected disabilities render her unemployable. In that regard and as noted above, the Board notes that the Veteran is in receipt of TDIU, effective from August 15, 2014. As such, the Board will limit its discussion to the period prior to that date.

The Veteran was afforded a VA examination in August 2007 for her migraine headaches. The Veteran reported that she had not worked since leaving the military due to multiple medical problems and that she was separated from service due to health problems that included headaches. At present, the Veteran had headaches almost every day. On almost every occasion she would have to take an Imitrex and a Lunesta and lie down and take about a three-hour nap. This would relieve the symptoms. As she was only allowed nine Imitrex a month, however, it made things difficult the other days of the month. She experienced a shooting pain behind the left eyeball that felt like it was squeezing her brain out. She also experienced nausea, blurred vision, and photophobia. Smells, bright lights, and back problems all could trigger the headaches. The diagnosis was mid-vascular musculoskeletal tension headaches with the above-mentioned frequency. 

The Veteran was afforded a VA examination for the right shoulder in September 2007. The Veteran reported pain in the anterior right shoulder, without radiation. She reported flare-ups of pain with any strenuous activity or overhead work. The condition overall was gradually getting worse and there were certain movements she would avoid because they hurt. There were no dislocations or subluxation. The Veteran was not working, but not due to the right shoulder. There were no problems with activities of daily living and when she last worked (during active service) she had pain in the shoulder, but it did not prevent her from doing her duty. She was right-hand dominant. Range of motion was full without significant pain during the examination. There was no fatigue, weakness, or lack of endurance. Repetitive motion testing did not result in decreased motion and the examiner indicated that it would be speculation to estimate the range of motion loss with flare-up. There was no objective evidence of pain, edema, effusion, instability, weakness, tenderness, redness, heat, abnormal movement, or guarding of movement. There was no ankylosis. The diagnosis was rotator cuff tear right shoulder status postop times two with residuals. 

A January 2008 VA treatment record included the Veteran's reports of two to three headaches per week, with migraine symptoms that could last from two to three days. The assessment was migraine headaches. Another January 2008 record indicated that the Veteran had "severe migraine headaches."

In a statement, the Veteran also indicated that she experienced four to six headaches per week, most of which were debilitating. They were triggered by bright lights, smells, noise, heat, and stress.

In an August 2008 statement, the Veteran reported that she had to use her left arm to perform certain activities of daily living, such as vacuuming, eating, and driving a car. 

A July 2009 VA vocational rehabilitation assessment indicated that because the Veteran's headaches would prevent her from working two to three days every week and that her light sensitivity would make driving to work difficult or impossible in many situations, that vocational rehabilitation was not a feasible option.

In her July 2009 substantive appeal for an increased rating for migraine headaches, the Veteran stated that she experienced two to three debilitating headaches per week and that she had been denied vocational rehabilitation because her headaches were so severe. 

A March 2011 letter from a treating VA physician noted that the Veteran suffered from debilitating migraine headaches and that she indicated that medications had either been effective or had side effects she could not tolerate. The letter stated that the migraine pain "has significantly impaired her ability to work and function."

The Veteran was afforded a VA examination in May 2011 for her migraine headaches. Currently, the Veteran was taking Imitrex and Excedrin migraine, with an average of six pills per day. The examiner noted that the response to treatment was fair. She denied having a headache every day, but would take the medication when one occurred. During worse headache episodes she was forced to lie down, but otherwise was able to continue her ordinary activities. During the past twelve months she had experienced weekly headaches, with less than half of the headaches being prostrating in nature. The usual duration of the headaches was hours long. The diagnosis was migraine headaches, with the effect on occupational activities being pain and no effect on usual daily activities. The examiner observed that the Veteran currently was unemployed, but that the specific reasons for the unemployment were not specified. 

A June 2011 VA examination report indicated that the Veteran had no lung, lumbar spine, or lower extremity condition that would prevent active or sedentary work.

An August 2013 statement from the Veteran's aunt detailed continuous right shoulder pain and problems. An August 2013 statement from the Veteran's husband indicated that her right shoulder pain was so severe that she had to sleep in a recliner at night. That statement also noted that the Veteran "spends half the week in bed due to migraine headaches. In our house we keep the blinds drawn and lights are rarely used as they cause or worsen her headaches. We cannot go to very many places in public because the smell of perfume and/or cologne which causes her to get a migraine that can take days to go away, even with the medicines prescribed to her."

During her August 2013 Board hearing, the Veteran discussed multiple in-service surgeries on the right shoulder, as well as treatment with steroid shots, physical therapy, and a TENS unit. She discussed painful range of motion at the shoulder level and above, as well as difficulty picking up a gallon of milk. Her shoulder also caused problems driving and pain while walking. As to her migraine headaches, the Veteran reported three to four migraines per week and discussed related symptoms of nausea, fatigue, light sensitivity, and memory problems. She asserted that she would have to take extended naps in the hope of getting rid of the migraines. She also indicated that she had "very few good days." One recent migraine had lasted for four days.

During a March 2014 VA examination for the right wrist, the Veteran indicated that she was right-handed and did everything with her right hand. Her husband had to do all the cleaning and most of the cooking because the Veteran was unable to do so due to her right wrist, bilateral shoulder, and low back pain. In a March 2014 VA examination for the right shoulder, the Veteran indicated that her shoulder pain affected everything she did. She was unable to sleep because she could not get comfortable due to her back and shoulder disabilities and range of motion of the right shoulder was limited with pain on any movement.

The Veteran was afforded a VA examination for the right shoulder in August 2014. The examiner noted review of the claims file and noted a diagnosis of rotator cuff tear status post two surgical repairs and bursitis. The Veteran reported that since her last VA examination she had worsening and more frequent pain and stiffness in the shoulder. She used a pain patch and TENS unit on bad days and reported difficulty driving and doing most household tasks. She was right-hand dominant. There were reported flare-ups with more pain with weather changes that resulted in her using more medication and to shift any load bearing to the left arm. On examination, right shoulder flexion was to 140 degrees, with pain onset at 130 degrees, while abduction was to 90 degrees, with pain onset at 80 degrees. On repetitive use, right shoulder flexion was reduced to 130 degrees and abduction to 80 degrees. Thus, there was additional limitation in range of motion following repetitive use testing, due to less movement than normal, weakened movement, excess fatigability, and pain on movement. There was no tenderness to palpation or guarding of movements. Muscle strength of the right shoulder flexors and abductors were each 4 out of 5. There was no ankylosis of the glenohumeral articulation (shoulder joint). Hawkins' impingement test, external rotation / infraspinatus strength test, and lift-off subscapularis test were each negative, but the empty-can test was positive, indicating a possible rotator cuff injury, including supraspinatus tendinopathy or tear. There was a history of mechanical symptoms, such as clicking or catching, but not recurrent dislocation (subluxation). There was no acromioclavicular joint condition or other impairment of the clavicle or scapula. The Veteran had a related right shoulder scar, but the scar was not painful, unstable, or greater than 39 square cm (6 square inches). Function was not so limited that the Veteran would be equally well served by an amputation with prosthesis. X-rays showed no arthritis. The right shoulder disability impacted the Veteran's ability to work in that even walking hurt her shoulder, as well as driving or lifting items the size of a gallon of liquid. The examiner concluded that it would be reasonable to conclude that given the 10 degrees of decreased motion on repetitive motion testing that there would be at least a 10 degree loss of motion during a flare-up. 

An August 15, 2014 VA medical opinion stated that, "because of pain and rapidly progressing fatigue in her right dominant shoulder and lumbar spine radiating into right leg the veteran states this eliminates all employment possibilities because she cannot comfortably sit well stand lift or sort even paperwork or packages. She states [she is] restricted home on bed rest too often to hold on a job and it feel its [sic] too limited in her ability to perform work."

In a May 2015 letter, the Veteran's attorney representative argued that TDIU was warranted from March 29, 2006. 

An October 2016 statement from the Veteran's attorney representative argued that the Veteran did warrant an earlier effective date of the assigned TDIU. In support of that proposition, the attorney cited to the Veteran's inability to work prior to discharge from service, even as a reading assistant for third graders. She had not worked since separation from service and even had been denied vocational rehabilitation because it was not reasonable to expect her to be able to train for or obtain a suitable job. In addition, a March 2011 VA treatment record noted that the Veteran's headache pain had significantly impaired her ability to work and function. Her award from SSA based on her ability to work was effective from March 2009. 

In this case, the evidence indicates that the Veteran has not worked at any point since separation from service. In addition, she is in receipt of disability benefits from the Social Security Administration (SSA), which she asserts is due to a combination of her service-connected disabilities. As to the Veteran's headaches, at least half of her multiple weekly headaches require that she nap for multiple hours and that the migraines themselves are triggered by smells, noise, heat, stress, and light, all of which can be found in most work environments. In addition, a July 2009 VA vocational rehabilitation assessment indicated that because the Veteran's headaches would prevent her from working two to three days every week and that her light sensitivity would make driving to work difficult or impossible in many situations, that vocational rehabilitation was not a feasible option. A March 2011 letter from a treating VA physician noted that the migraine pain "has significantly impaired her ability to work and function." The Veteran's service-connected orthopedic disabilities also result in significant impairment of physical activities, to include extended sitting or walking, which would make functioning in most jobs very difficult. These conditions have been generally consistent throughout the appellate time period.

Thus, for the entire appellate time period the Board finds that the Veteran has been excluded from any work requiring significant physical activity and that her regular and severe headaches would make it extremely difficult for the Veteran to function effectively in any other work environment.

As such, the Board concludes that the evidence is at least in relative equipoise as to whether the Veteran is unable to secure or maintain substantially gainful employment and, therefore, entitlement to TDIU is warranted from March 29, 2006, the day following her release from service. In assigning the foregoing date, the Board recognizes that her initial claim for entitlement to TDIU was not received by VA until August 2, 2007, which is more than one year after her separation from service. That said, her claim for entitlement to service connection, and subsequently increased rating, for migraine headaches was filed within one year of separation from service and as part of that claim she asserted that her migraine headaches rendered her unemployable. See Rice v. Shinseki, 22 Vet. App. 447 (2009) (holding that "a request for TDIU, whether expressly raised by a veteran or reasonably raised by the record, is not a separate claim for benefits, but rather ... an attempt to obtain an appropriate rating for a disability or disabilities").


ORDER

Entitlement to an increased rating greater than 10 percent for recurrent lumbosacral strain is denied.

Entitlement to TDIU is granted from March 29, 2006, subject to the laws and regulations controlling the award of monetary benefits.


REMAND

As discussed in the prior March 2016 Board determination, in a May 2014 rating decision the RO denied entitlement to service connection for posttraumatic stress disorder (PTSD), left knee strain, and right knee strain, as well as denied a petition to reopen a claim for entitlement to service connection for a left shoulder disability based on the provision of new and material evidence. In June 2015, the Veteran submitted a notice of disagreement with the rating decision with respect to those issues. In July 2015, the RO sent the Veteran a letter acknowledging her notice of disagreement with respect to the foregoing issues. At the time of the March 2016 Board determination, the issues were listed as on appeal as a result of the notice of disagreement in the electronic Veterans Appeals Control and Locator System (VACOLS). However, since that time the RO does not appear to have issued a Statement of the Case (SOC), yet has closed the appeal in VACOLS with the notation that the Veteran had failed to respond. The Board finds no evidence that the Veteran withdrew her claim for the foregoing and, as such, the Board finds that a remand is warranted for the issuance of an SOC. See Manlincon v. West, 12 Vet. App. 238, 240-41 (1999).

Accordingly, the case is REMANDED for the following action:

Issue a statement of the case that addresses the Veteran's claims for entitlement to service connection for posttraumatic stress disorder (PTSD), left knee strain, and right knee strain, as well as denied a petition to reopen a claim for entitlement to service connection for a left shoulder disability based on the provision of new and material evidence. If, and only if, the Veteran perfects an appeal with respect to any of those claims, the AOJ should ensure that any indicated development is completed before the issue is certified for appellate consideration.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
MICHAEL A. PAPPAS
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs